UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,
           Plaintiff,

v.                                                  Case No.  6:15-cv-1429-Orl-31 DAB

URS FEDERAL SERVICES, INC. and
YANG ENTERPRISES,
           Defendant

## COMPLAINT PURSUANT TO THE FALSE CLAIMS ACT

Despite receiving almost one and a half billion dollars of contracted work from the United States Government, Defendants URS Federal Services, Inc. ("URS"), and it subcontractor Yang Enterprises, Inc. ("Yang"), have systematically defrauded the government. While isolated, this particular fraud involves the undocumented and unreasonable early replacement of tires for which URS and Yang agreed to serve as the fleet manager at Kennedy Space Center. Rather than be a mere technical or trivial problem, to the contrary, URS and Yang have received more than $387,000 in illegally gotten moneys due to their actions. Accordingly, on behalf of the National Aeronautics and Space Administration (NASA) and the General Services Administration, Plaintiff United States of America brings forth this lawsuit pursuant to the False Claims Act.

## I. NATURE OF ACTION

1. The United States brings this action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq,* as well as the common law or equitable theories of unjust enrichment and payment by mistake.

2. The United States bases its claims on Defendants submitting and causing to be submitted false or fraudulent claims to the federal government in violation of 31 U.S.C. §§ 3729(a)(1), 3729(a)(1)(A), and 3729(a)(1)(B).

3. Within the time frames detailed below (namely from approximately June 1, 2009 until April 2015), Defendants knowingly submitted, or caused to be submitted, over a thousand false claims to GSA and NASA for reimbursement which resulted in hundreds of thousands of dollars of reimbursement that would not have been paid but for Defendants' misconduct.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345.

5. This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) and because Defendant URS transacts business in the Middle District of Florida. Defendant Yang both transacts business and resides in the Middle District of Florida.

6. Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendants transact business in this District.

### III.     PARTIES

7.      Plaintiff, the United States, brings this action on behalf of: 1) the General Services Administration (GSA) and 2) the National Aeronautics and Space Administration (NASA).

8.      The United States, through NASA, owns and operates Kennedy Space Center (KSC), a large facility in Florida.  In an effort to streamline management of KSC, NASA has contracted with several companies to provide facility-related services, including Defendant URS Federal Services, Inc.

9.      Defendant URS Federal Services, Inc. (URS) is a contractor to the federal government who provides technical, engineering, and construction services. URS is based in Germantown, Maryland.  URS currently is a recipient of a $1.4 billion Institutional Services Contract (ISC) to NASA at Kennedy Space Center.  Among other responsibilities, URS has agreed to undertake the responsibility for managing a fleet of vehicles at NASA.

10.     Defendant Yang Enterprises, Inc. (Yang) is a subcontractor based in Florida.  As part of the Institutional Services Contract described above, URS delegated responsibility for fleet management to Yang.

### IV. FACILITIES AND CONTRACTING BACKGROUDND

11.     As part of its normal operations, NASA contracts with various large contractors to provide support services at its facilities.  For pertinent purposes, NASA contracts with a variety of companies to provide services to Kennedy Space Center.

12. On June 18, 2008, NASA awarded a $1.461 billion Cost Plus Award Fee contract to URS. This contract was numbered #NNK08OC01C.

13. Because of the nature of government procurement, both NASA and GSA were responsible for overseeing compliance with the contract.

14. Among other things, this Contract tasked URS to perform a variety of tasks – including vehicle management.

15. Sometime between 2008 and the present, URS delegated the function of vehicle management to its subcontractor, Yang Enterprises. However, at all relevant times, URS remained the prime contractor to NASA for these services.

16. As part of the scope of work, URS agreed to undertake responsibility for vehicle management. *See* Exhibit A, Section 5.3.1 of Attachment J.1 – Performance Work Standard.

17. Vehicle Management tasks included ensuring that the vehicles are properly maintained in accordance with applicable guidelines and that those vehicles meet contractual requirements.

18. In an effort to fulfill its vehicle management requirements, and pursuant to the Institutional Services Contract, URS drafted a document describing its policies and procedures for fleet management. *See* Exhibit B, ISC Procedure, Number TRA-P-0008.

19. Among other things, URS' *own* guidelines provided that URS would "[r]estrict the use of all Government motor vehicles, including those rented or leased, to official purposes only," "[r]eport suspected vehicle misuse/abuse cases to

Vehicle Management," "[p]rovide guidance in specific cases where the official nature of vehicle usage is in question, "[r]esolve questions concerning the official use of Government vehicles in favor of strict compliance with statutory provisions," "[r]eport misuse, abuse, and damage to assigned vehicles, investigate vehicle incident, accident, misuse, and abuse cases; recommend corrective action to respective management," and "[e]nsure vehicle inspection discrepancies identified by Vehicle Management are completed within timeline given." *See generally id.*

20. GSA and NASA relied on the representations in the "ISC Procedure" document in order to determine compliance with the contract.

## V. TIRE REPLACEMENTS

21. Once URS and Yang were responsible for managing a fleet of approximately 400 vehicles, the Contract required that URS and Yang ensure the general maintenance and upkeep of vehicles.

22. Importantly, the contract did not require that URS or Yang directly service the vehicles. Rather, service of vehicles was performed by outsider vendors.

23. Because certain repairs have the potential to be expensive, GSA requires that vehicle custodians and operators take vehicles to repair facilities and – once the facility has examined the vehicle – the facility will call GSA to obtain approval and authority to conduct the repair.

24. In making a determination as to the reasonableness of the repairs, GSA relies on the representations of the repair facility, the vehicle custodian and the vehicle operator.

25. While GSA is able to obtain some oversight of the process through the requirement of pre-authorization before service repairs, GSA nonetheless relies on vehicle custodians and operators to properly maintain vehicles *prior* to ever taking vehicles to a repair facility.

26. And, to be sure, GSA has been particularly concerned with tire repairs on vehicles as "tires are the second highest expense after fuel." *See* Exhibit C, GSA Guidance to Vehicle Custodians.

27. Because GSA is so concerned about the cost of tire repairs, GSA has created a "billback program" wherein certain government agencies are directly billed for early tire replacements.

28. Through the "billback program," replacement of tires with less than 20,000 miles of wear are billed to the relevant government agency (in this case, NASA), rather than to GSA directly.[1]

---

[1] The GSA policy regarding billbacks was amended in August 2014. Prior to August 2014, when a tire had less than 15,000 miles of use, the relevant agency (in this case, NASA) would be responsible for 100% of the tire payments. For tires with between 15,000 and 20,000 miles of use, GSA and the relevant agency would split the cost of the tire replacement 50%/50%. After August 2014, the policy was amended. Under the new policy, the designated agency is responsible for bearing 80% of the cost for tires replaced with less than 8,000 miles of use; for vehicles between 8,001 and 16,000 miles, the agency bears 60% of the cost; for vehicles between 16,001 miles and 24,000 miles, the agency bears 40% of the cost; and for vehicles between 24,001 and 32,000 miles, the agency bears 20% of the cost. While this new policy reflects a greater GSA share on tire billbacks, the policy does also recognize that most tires should last 32,000 miles. For purposes of this case, the United States is only considering tires with usage of less than 20,000 miles.

29. In choosing the 20,000 mileage threshold, GSA has recognized that most tires should be capable of having at least 20,000 miles of wear before the need for replacement.

30. In general, tire repair experts have commented that most vehicles do not need tire replacements in the first 25,000 miles of use, absent catastrophic failure or a tire puncture due to a nail or other protrusion.

31. The "billback program" is designed to keep tire costs manageable and place the onus on government agencies to oversee the actual repair costs.

## VI. THE LAW

### A. *The False Claims Act*

32. The False Claims Act provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States Government. 31 U.S.C. § 3729(a)(1).

33. The FCA provides, in pertinent part, that:

> (a)(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . ;

* * *

>is liable to the United States Government for a civil penalty of not less than $[5,500] and not more than $[11,000], . . . plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

31 U.S.C. § 3729.[2]  For purposes of the False Claims Act,

>the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information,
>
>and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b) (1986).

---

[2] The False Claims Act was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009.  Given the nature of the claims at issue, Section 3279(a)(1) of the statute prior to FERA, and as amended in 1986, and Section 3729(a)(1)(A) are both applicable here.  Section 3729(a)(1) applies to conduct before FERA was enacted, and section 3729(a)(1)(A) applies to conduct after FERA was enacted.  Section 3729(a)(1)(B) was formerly Section 3729(a)(2), and is applicable to all claims in this case by virtue of Section 4(f) of FERA.

### B. The Federal Acquisition Regulations

34. As part of its normal procurement process, the Government promulgates specific requirements in the Federal Acquisition Regulations (FAR). At least two relevant FAR provisions are directly applicable to this case.

35. First, FAR provision 52-252-2 requires that URS – and its subcontractors – maintain adequate records to reflect ***all*** work and costs claimed on a government contract. This provision was incorporated into the contract. *See* Exhibit D at D-2.

36. In pertinent part, FAR 52-252-2 provides:

> As used in this clause, records includes books, documents, accounting procedures and practices, and other data . . . If this is a cost-reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, ***the Contractor shall maintain*** and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit ***all records and other evidence sufficient to reflect properly all costs claimed to have been incurred*** or anticipated to be incurred directly or indirectly in performance of this contract. (emphasis added)

37. In addition to FAR 52-252-2, FAR Part 31 – Contract Cost Principals and Procedures – was incorporated into this contract. *See id.* This provision provides that the Government will only pay for "allocable, reasonable, and allowable costs."

38. Put another way, when a contractor submits costs that either (a) lack "records and other evidence sufficient to reflect properly all costs claimed" or (b)

are not "allocable, reasonable, and allowable," then the contractor violates the FAR and submits a false claim sanctionable pursuant to the False Claims Act.

### VI. DEFENDANTS' FRAUDULENT CONDUCT

#### A. *Defendant Knowingly Submitted False Claims to the Government*

39. Beginning in June 2009 – and continuing to at least April 2015– the Defendants either knowingly, recklessly, or as a product of deliberate ignorance, submitted false claims to the federal government for payment.

40. During the relevant time period, URS and Yang submitted an unprecedented number of vehicle tire billbacks to NASA, even excluding the vehicles that had tire blow outs or catastrophic damage.[3]

41. For example, since October 1, 2008 until April 2015, URS and Yang billed for tire replacements for at least 44 vehicles with these tires having less than 10,000 miles of use.

42. Put another way, roughly 10% of the fleet that URS and Yang were responsible for had vehicles with tires that did not even last 40% of the expected life of a tire.

43. During that same time period, URS and Yang billed for tire replacements of 193 vehicles with these tires having less than 15,000 miles of use.

---

[3] For purposes of paragraphs 41-56, the United States has excluded from consideration any damage to tires due to nail puncture, blowout, catastrophic damage, or otherwise.

44. Put another way, roughly half of the fleet that URS and Yang were responsible for had vehicles with tires that did not even last 60% of the expected life of a tire.

45. For example, URS and Yang were responsible for maintaining control over vehicle G43-0888L. From a period of July 16, 2012 until October 14, 2014, this vehicle had at least six tire replacements costing NASA more than $1,800.[4] These repairs occurred on July 16, 2012, July 9, 2013, January 13, 2014, March 19, 2014, May 13, 2014, June 10, 2014, and October 14, 2014.

46. When the tires on vehicle G43-0888L were replaced, no tire had more than 17,435 miles of use. Rather, tires were replaced in some cases with just 4,000 or 5,000 miles of use.

47. By way of another example, URS and Yang took vehicle G43-0511H to Ramsey Automotive for repairs in February 2014.

48. Ramsey Automotive's own technicians expressed concern about the proprietary and need for tire replacements. *See* Exhibit E, Summary of GSA Employee Stephen Baughn's Phone Conversation with Ramsey Automotive.

49. Ramsey Automotive was concerned because the tire being replaced was "completely bald and had a wear pattern of a vehicle with a serious alignment problem." *Id.*

---

[4] The $1,800 figure stated above is exclusive of the cost that GSA contributed to tire repairs.

50. Despite the tire indicating alignment problems, the alignment "checked out perfect on this vehicle." *Id.*

51. The wear pattern of the tire was also evident of a tire that would have worn that way on the front of a vehicle based on the chopping of the side. "This tire was found on the Right Rear Outside." *Id.*

52. There also appear to be concerns that the tires included on this vehicle at the previous time of service were removed and replaced with inferior tires prior to being re-serviced. *Id.*

53. Nonetheless, despite the indicia of suspicious warning signs, GSA – relying on URS and Yang's representations about the proper maintenance of the vehicle – authorized repairs to this vehicle. In all, the repairs for this one tire replacement cost NASA $119.24.[5]

54. In total, these early, unnecessary and undocumented repairs cost NASA hundreds of thousands of dollars. And there is nothing to suggest need, reasonableness, or proper documentation.

55. The sheer magnitude and frequency of repairs is far greater than to be expected. Submitting such a high number of early tire replacements is not reasonable under the contract provisions.

---

[5] Like the previous example, this cost to NASA is exclusive of the cost that GSA itself paid.

56.     Should these repairs actually not be reasonable, then these repairs are necessarily false claims since the contract only allowed for the reimbursement of reasonable expenses.

### B. Defendants Were Deliberately Ignorant – or Reckless – in Submitting False Claims to the Government

57.     As expressed above, the requisite scienter for a False Claims Act case is knowledge, recklessness, or deliberate ignorance.  In this case, ample evidence suggests that the Defendants were – at a minimum – deliberately ignorant or reckless.

58.     For example, Yang's Fleet Manager – the individual responsible for ensuring compliance with this portion of the Contract – was interviewed last year regarding this investigation.  *See* Exhibit F, Interview of Yang Fleet Manager.

59.     Among other things, the Fleet Manager was unable to explain what made a tire repair suspect or whether she actually checked the frequency of repairs.  *Id.*  At no time did the Yang Fleet Manager suggest that the frequency of tire replacements was due to hazardous or adverse road conditions.  *Id.*

60.     Indeed, the Fleet Manager was unable to identify to the Government when certain tires needed replacements, what would explain the need for the high number of early replacements, or what factors are considered in approving a vehicle custodian to suggest an early tire replacement.   *Id.*

61. The Fleet Manager had no explanation for the high number of replacements. She herself suggested this high rate of repairs could only be explained by fraud. *Id.*

62. At a minimum, when the head of Fleet Management herself cannot explain the process for tracking or monitoring billable costs, the scienter requirement of deliberate ignorance is satisfied.

### C. Defendants Failed to Maintain Records Related to Claims to the Government

63. Further, apart from everything else and despite the program requirement that *all* claims for reimbursement have adequate documentation, URS and Yang failed to maintain *any* meaningful documentation to support early tire replacements.

64. To this end, Yang's Fleet Manager – the individual responsible for ensuring compliance with this portion of the Contract – was interviewed last year regarding this investigation. *See* Exhibit F.

65. When asked for records to support the need for early tire replacements, the Fleet Manager was unable to do so. When asked what she does with tire replacement records, she indicated that these records are routinely discarded. *Id.*

66. The failure to maintain records to justify claims to the government is itself a violation of the contract and is, alone, actionable.

**FIRST CAUSE OF ACTION**
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1) and (a)(1)(A))

67.     The United States repeats paragraphs 39-66 as if fully set forth herein.

68.     Defendants URS and Yang knowingly presented and caused to be presented false or fraudulent claims for payment or approval to the United States by submitting claims for early tire replacements that were not reasonable nor documented, as required by the pertinent Federal Acquisition Regulations.

69.     By virtue of the false or fraudulent claims that defendants made and/or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

**SECOND CAUSE OF ACTION**

(False Claims Act: Presentation of False Statements to Get False Claims Paid)

(31 U.S.C. § 3729(a)(1)(B))

70.     The United States repeats and realleges paragraphs 39-66 as if fully set forth herein.

71.     Defendants URS and Yang knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid by the United States for early tire repairs that were not reasonable nor properly documented.

72. By virtue of the false or fraudulent claims that Defendant made and/or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### THIRD CAUSE OF ACTION
(Unjust Enrichment)

73. The United States repeats and realleges paragraphs 39-66 as if fully set forth herein.

74. The United States claims the recovery of all monies by which Defendants have been unjustly enriched.

75. As a consequence of the acts set forth above, Defendants were unjustly enriched at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience should be returned to the United States.

### FOURTH CAUSE OF ACTION
(Payment by Mistake)

76. The United States repeats and realleges paragraphs 39-66 as if fully set forth herein.

77. The United States claims the recovery of all monies by which URS and Yang have been paid by mistake.

78. As a consequence of the acts set forth above, URS and Yang were paid by mistake at the expense of the United States in an amount to be determined which,

under the circumstances, in equity and good conscience, should be returned to the United States.

**PRAYER FOR RELIEF**

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendant as follows:

I.      On the First Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

II.     On the Second Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

III.    On the Third Count for unjust enrichment, for the damages sustained and/or amounts by which Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

V.      On the Fourth Count for payment by mistake, for the damages sustained and/or amounts by which Defendants were paid by mistake or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

The United States demands a jury trial in this case.

Dated this 2nd day of September, 2015.

    Respectfully submitted,

    A. LEE BENTLEY
    United States Attorney


    /s/ Jason P. Mehta
    JASON PAUL MEHTA
    Assistant United States Attorney
    FL Bar No. 0106110
    300 North Hogan Street, Suite 700
    Jacksonville, Florida 32202
    Telephone:  (904) 301-6300
    Facsimile:   (904) 301-6310
    Jason.Mehta@usdoj.gov