```
 1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
 2                  ORLANDO DIVISION

 3             Docket No. 6:15-cv-1429

 4   . . . . . . . . . . . . . .
     UNITED STATES OF AMERICA    :
 5                               :        Orlando, Florida
             Plaintiff           :        December 1, 2015
 6                               :        1:00 p.m.
                  v.             :
 7                               :
     URS FEDERAL SERVICES, et al :
 8                               :
             Defendants          :
 9   . . . . . . . . . . . . . .

10

11           TRANSCRIPT OF MOTION TO DISMISS
         BEFORE THE HONORABLE GREGORY A. PRESNELL
12             UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   For the Plaintiff:  Jason Paul Mehta

17

18   For the Defendant URS: Benjamin Razi

19   For the Defendant Yang Enterprises: John Hanson

20
     Court Reporter:      Sandra K. Tremel, RMR/CRR
21                        407-288-6343

22

23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Okay.  Call the case, Lisa.
 3            THE DEPUTY CLERK:  This is in the matter of the
 4   United States of America vs. URS Federal Services
 5   Incorporated and Yang Enterprises.  Case number
 6   6:15-cv-1429-Orl-31DAB.
 7            THE COURT:  Okay.  Appearing for the plaintiff
 8   being the United States.
 9            MR. MEHTA:  Good afternoon, Your Honor.  Jason
10   Mehta on behalf of the United States.
11            THE COURT:  Okay.  For the defendants?
12            MR. RAZI:  Good afternoon, Your Honor.  For URS
13   Benjamin Razi from Covington Burling.
14            MR. HULL:  Brian Hull from Bush Ross.
15            MR. HANSON:  Good afternoon, Judge.  On behalf of
16   the Yang Enterprises, John Hanson.
17            THE COURT:  Okay.  Thank you.
18        Well, I don't usually schedule hearings on these
19   things, but in reading through these papers I had concerns
20   about the sufficiency of the complaint and also some
21   questions about the basic structure of this arrangement
22   which I thought might better be handled in a hearing where
23   you can educate me better than me trying to figure it out
24   and enter an order not knowing what I'm dealing with.  So
25   let me kind of tell you what I think is going on here and
```

1   then you can tell me where I'm wrong.

2       The defendants URS and Yang, and I guess URS is a

3   subcontractor and Yang a sub-subcontractor.  I don't know

4   that that necessarily matters, but.

5           MR. RAZI:  I think it's contractor and then sub.

6           THE COURT:  Okay.  They have an agreement with

7   NASA to maintain a fleet of about 400 vehicles, as I

8   understand it, among other things.  I mean, that's part of

9   that contract with NASA, as I understand it.  And in

10  connection with this tire matter, the flow of activity, as I

11  understand it, again, is first an operator of one of the

12  vehicles will indicate that it needs a new tire or some sort

13  of tire maintenance.  Now, is that operator a NASA employee

14  or a contractor or subcontractor employee?

15          MR. MEHTA:  And, Your Honor, if I may.

16          THE COURT:  Sure.

17          MR. MEHTA:  Speaking on behalf of the United

18  States, the way that NASA's arrangement to work is that URS

19  and its subcontractor Yang maintain primary responsibility

20  for these vehicles.  It is up to one of those -- it is up to

21  one of their employees, one of URS or Yang's employees, to

22  identify if there are issues or problems with the vehicle.

23          THE COURT:  Well, that's not my question.  My

24  question who is the operator of the vehicle.  Is it NASA

25  people?  Do they just maintain them, or do they also drive

1   them?

2           MR. MEHTA:  My understanding, Your Honor, is that

3   they, being URS and Yang, also drive the vehicles.  They are

4   the operators.

5           THE COURT:  All right.  So one of those guys

6   driving a vehicle says that needs a new tire, and he will

7   make that request to the vehicle custodian, and I understand

8   these custodians have responsibility for different segments

9   of the fleet.  The vehicle custodian then will make a

10  request to the fleet manager, who is Ms. Everhart, for the

11  tire repair, and Ms. Everhart will then approve that and

12  send a -- a GSA will then choose a vendor and the vendor

13  then looks at the vehicle and I presume makes some decisions

14  as to what needs to be done and requests approval from the

15  GSA and the GSA approves the repair, the repairs are made,

16  and the vendor sends an invoice for the value of the

17  vendor's service.  That invoice goes, as I understand it, to

18  GSA unless it's an exception to this arrangement in which

19  somehow a portion or all of that invoice gets billed back to

20  NASA.  And so I'm trying to follow the money here.

21      How will URS or Yang benefit from having tires changed

22  more frequently than they should be?  Now, I can understand

23  you may have a claim of breach of contract but I'm talking

24  fraud here.  How does URS or Yang benefit from this flow of

25  money and invoices and GSA requests, et cetera?  Maybe the

 1    government can start helping with that.

 2             MR. MEHTA:  Absolutely, Your Honor.  May I

 3    approach the podium?

 4             THE COURT:  Yes, please do.

 5             MR. MEHTA:  Thank you, Your Honor.

 6        Your Honor, I think that the way you have outlined the

 7    process is generally correct with one or two minor

 8    variations that might be relevant in this case.

 9             THE COURT:  Okay.

10             MR. MEHTA:  I think up until the part of where the

11    vehicle repair takes place, I think you've summarized it

12    correctly.  The repair is actually done by the facility so

13    Ramsey, for example, they would do the repair.  They will

14    then send the invoice to URS or to Yang.  URS or Yang would

15    then submit the invoice to the government.  And that's the

16    one point I wanted to kind of differentiate.

17             THE COURT:  That helps.

18             MR. MEHTA:  Your Honor --

19             THE COURT:  Wait a minute.  But wait a minute,

20    when you say URS submits the invoice to the government, what

21    part of the government?

22             MR. MEHTA:  That is an important point.  It's

23    submitted to GSA directly.  GSA, as you alluded to, Your

24    Honor, has a program with many different agencies including

25    NASA in this case because tire expenses are a very large

```
 1   component of vehicle maintenance.  In certain cases where

 2   tires are changed and GSA finds prematurely when they are

 3   changed under 20,000 miles, certain portions of that will

 4   then be billed from GSA to NASA.  So it's actually GSA who's

 5   doing that separate division of which parts GSA pays for and

 6   which parts NASA pays for.

 7            THE COURT:  And how is that regulated?  Is there a

 8   intragovernment agreement between GSA and NASA that -- that

 9   determines what bill backs GSA can put back on NASA?

10            MR. MEHTA:  Absolutely, Your Honor.  And in fact,

11   if I can point you, Your Honor, to page 6 of the complaint,

12   it's paragraph 28, and paragraph number 1 or footnote number

13   1, that talks admittedly in high level detail about this

14   program, but this is an arrangement that GSA has been placed

15   with not just NASA but with a variety of different federal

16   agencies, that based on a number of mileage between tire

17   repairs, a certain portion of that -- a percentage of the

18   charge for replacement tires will be billed to the agency

19   directly as opposed to GSA and, again, the idea --

20            THE COURT:  So some of those invoices GSA pays no

21   problem?

22            MR. MEHTA:  That's correct, Your Honor.

23            THE COURT:  Other invoices GSA says that tire

24   doesn't meet our criteria.  Therefore, we're going to charge

25   back 10 percent of that to NASA, for example.
```

```
 1              MR. MEHTA:  More or less, that's correct, Your

 2    Honor.

 3              THE COURT:  Okay.

 4              MR. MEHTA:  And that's one point I wanted to

 5    just --

 6              THE COURT:  No.  I'll --

 7              MR. HANSON:  I just want to clarify, Judge, how

 8    you wanted us to proceed.  If we have some issue with

 9    something that --

10              THE COURT:  You write down anything you want to

11    tell me when I get to you.  You will have all day.

12              MR. HANSON:  Perfect, Judge.  I'll sit here

13    quietly until we get there.

14              THE COURT:  I don't have anything else this

15    afternoon.

16              MR. MEHTA:  And so Your Honor, I think the

17    gravamen, the thrust of your question really is what's the

18    motivation behind here?  How does any of the defendants or

19    the government -- why would they have incentive, why would

20    they have motivation to bill the government in our minds for

21    unreasonable, unnecessary, undocumented tire repairs.  And

22    to get to that question I think admittedly let me start by

23    saying it's a nuance and it's a subtle analysis that we

24    take.  It is not the quintessential fraud case.

25              THE COURT:  Well, okay.  And I guess you also have
```

1   to concede that usually fraud cases are not based on subtle

2   nuance.

3           MR. MEHTA:  Absolutely, Your Honor.  Nonetheless,

4   we do believe and we're confident in this case, Your Honor,

5   that under the False Claims Act there is ample legal

6   authority for this theory, and if I can walk you through

7   this and then you will at least understand the government's

8   perspective on this.

9           THE COURT:  I'm not going to interrupt you again

10  for at least 90 seconds.

11          MR. MEHTA:  And any time you would like, Your

12  Honor, feel free to interrupt me.

13      Under the False Claims Act liability attaches not just

14  to those that submit claims to the government that we

15  believe are false or fraudulent, but it also attaches to

16  those that cause false claims to be submitted to the

17  government.  So it imposes an extra level, an extra layer of

18  potential liability.  Likewise --

19          THE COURT:  So I'm sorry.  I didn't wait 90

20  seconds.

21          MR. MEHTA:  That's okay, Your Honor.

22          THE COURT:  Go ahead.

23          MR. MEHTA:  All right.  Are you sure?

24          THE COURT:  Well, yeah.  I'm just trying to --

25  what you're telling me then is that Ramsey is the one making

1   money off this deal and there's some sort of deal between

2   Ramsey and these other vendors and URS to cheat the

3   government?

4           MR. MEHTA:  No.  I don't think that's kind of the

5   import of it.  Maybe if I can jump to the conclusion and

6   then I can walk through the analysis.  The conclusion from

7   the government's perspective, after about a year and a half

8   of investigation, is that it's instead several handful of

9   rogue employees that simply are taking off the vehicles --

10  taking off tires from vehicles, putting on used tires on

11  those same vehicles, and then taking those vehicles to the

12  Ramseys of the world to have those tires replaced.  And the

13  motivation therefore, Your Honor, is that those individuals,

14  those rogue employees have a motivation because by taking

15  off good, valuable tires or replacing them with less

16  valuable tires that that difference -- they can obtain

17  payment by selling the good tires on a black market, for

18  example, that's where the individual motivation comes from.

19  Where motivation coming from a higher level why we're not

20  pursuing the individuals instead by pursuing the contractor

21  as the subcontractors who we would present have

22  responsibility for these individuals is because URS and Yang

23  have no way of tracking which individual and which custodian

24  had access to a certain vehicle at a certain time.  There's

25  no way the government's hamstrung and able to identify

```
 1    specific actors that remove tires.  Instead, the government

 2    is left in a position to look at the URSs and the Yangs of

 3    the world and say that you have assumed responsibility for a

 4    fleet of vehicles here at NASA 400 vehicles, somehow some

 5    employees, whether rogue or not, are taking off tires on

 6    these vehicles, presenting cars that have obvious problems

 7    that, for example, one vehicle which we have presented and

 8    spoke about and gave statements from Ramsey employees

 9    obvious problems where the alignment doesn't check out with

10    the tire usage pattern.

11             THE COURT:  Okay.  Let me -- it's been 90 seconds.

12    Let me stop you on that one.

13             MR. MEHTA:  Of course.

14             THE COURT:  You have a six-wheel vehicle that's

15    brought in -- let me get my notes here -- and what is pretty

16    obvious to me from the complaint and the attachments to the

17    complaint is that that vehicle had five Geo-Trac tires on it

18    and one Westlake tire.

19             MR. MEHTA:  Yes.

20             THE COURT:  The Westlake tire clearly came from

21    another vehicle.  One, it's the only one out of six that is

22    not a Geo-Trac.  Two, its tire wear appears to have been on

23    the front of a misaligned vehicle, and when it was brought

24    into the shop it was on a rear aligned vehicle.  Conclusion,

25    that tire came from another vehicle.  So what?  I mean,
```

 1   there's nothing at all unusual about if you have a tire on

 2   one vehicle that's flat, you go get another tire and put it

 3   on until you can go get it repaired.  I don't see the -- I

 4   mean, there is an equally innocent explanation for that.

 5           MR. MEHTA:  You're right, Your Honor.  A couple of

 6   points here.  Number one, the so what question is when the

 7   government hears from its tire repair facilities that they,

 8   the tire repair facilities, do not sell these Westlake

 9   vehicles -- Westlake tires, when the government hears that,

10   we're left to conclude that the tire was repaired by a

11   nonauthorized and nonestablished source.

12           THE COURT:  You haven't alleged any of this.

13           MR. MEHTA:  Your Honor, I actually believe that by

14   the exhibits, Exhibit E, for example --

15           THE COURT:  Okay, yeah.

16           MR. MEHTA:  -- does allege this.  And if I may

17   point the Court specifically to -- it's page 303 of the

18   docket.  It's Exhibit E, page 3 of 3.

19           THE COURT:  Exhibit E is only a two-page exhibit.

20           MR. MEHTA:  I'm sorry.  I'm looking, Your Honor,

21   at -- the page number is at the very top, so on the -- it

22   was printed on the ECF filing.  But if you look at the

23   second page of the exhibit.

24           THE COURT:  Okay.  I'm with you.

25           MR. MEHTA:  Perfect.  Thank you, Your Honor.

```
1        I'm looking at the first full paragraph from the e-mail

2   from Stephen Vaughn who is a GSA fleet representative and

3   employee for GSA, and he writes in his e-mail, it's also

4   contemporaneous with the initiation of this investigation

5   back in February of last year, if you look at the types of

6   tires purchased and the types of tires on the vehicles they

7   don't add up.  There are three Geo-Trac brand-new tires of

8   which we have never purchased for this vehicle.  The

9   Westlake tire was the one we found to be completely bald,

10  and KSC service station is the only vendor we are aware of

11  around here that installs Westlake tires.  They also do work

12  on personal vehicles as well as government vehicles.

13  Geo-Trac tires are sold typically only by Sears and none of

14  the GSA vehicles purchased tires from Sears.

15       I think fairly, Your Honor, if you read the exhibits

16  attached to the complaint by either inference or directly,

17  what's being alleged here is that tires are purposely --

18  that at a minimum what is being alleged is that tires are

19  being replaced in vehicles that were never authorized and

20  never approved by GSA in the first instance.

21            THE COURT:  Well, that's a totally different claim

22  than what's in your complaint.

23            MR. MEHTA:  I think the complaint is that the

24  repairs that did take place were not documented and they

25  were not reasonable and they were unnecessary and that is
```

 1  the product of either intention.

 2          THE COURT:  Well, maybe the contractors bought the

 3  tires and don't need to go to the government out of sense of

 4  goodwill, I mean.

 5          MR. MEHTA:  Certainly I would appreciate any

 6  goodwill, but I'm not sure that that can fairly be inferred

 7  based on the totality of the facts.  Right?  So if --

 8          THE COURT:  Well, neither can your attempt to

 9  imply that somehow they cheated the government by somehow

10  getting these tires that you don't know about.

11          MR. MEHTA:  That's right, Your Honor, but I think

12  what supplants all of that -- I mean, I think if all this

13  case was built was the statement of one employee at Ramsey

14  Automotive, perhaps then it doesn't survive a Rule 8 or a

15  Rule 9 motion.  But there's much more here.  Right?  In

16  addition to that what we have attached as Exhibit F is the

17  statement from Ms. Everhart, the woman that Your Honor

18  mentioned earlier, and if I could point the Court to the

19  last page of her exhibit.

20          THE COURT:  Yes.  I have read it thoroughly

21  several times.  And I think you grossly mischaracterize what

22  she's saying here.  But go ahead.

23          MR. MEHTA:  I apologize, Your Honor.  The last

24  page under egregious vehicles paragraph, SA, Special Agent

25  Miss Zelda and SA Special Agent Wells show a list 10 GSA

```
1    vehicles managed by a part where approximately 12 to 24 tire

2    replacements have been requested and completed for each

3    vehicle with anywhere from 800 to 2,400 miles per tire.

4    Everhart stated she could not explain the frequency of tire

5    replacements.  So the import and the thrust of that

6    paragraph and of that statement is that when presented with

7    a dozen to two dozen different tire repairs, Miss Everhart

8    was unable to point to any other explanation, was unable to

9    point any explanation.

10            THE COURT:  Well, her explanation is we have a

11   procedure in which there are numerous people, including GSA,

12   that participated in the decision to repair a tire and other

13   than that, no, I don't have an explanation.  I mean, there

14   is a process to me that appears to be fairly substantial

15   that goes through an operator, then it has to go through two

16   levels of management and then it goes to the vendor, and it

17   has to be approved by GSA, and she's saying that's our

18   process and that's the only way I can explain it.  It's not

19   like I'm hiding something or I'm not keeping records I

20   should keep.

21            MR. MEHTA:  I think that's right.

22            THE COURT:  I mean, is there something in your

23   contract that requires them to specifically track the

24   mileage on each tire that they're using?

25            MR. MEHTA:  What is required in the contract is
```

```
 1    that any cost submitted to the government be allowable.  So

 2    therefore be able to point specifically to what it is that

 3    you're charging the government for.  So that would be one

 4    provision explicitly in the contract.  To be fair, Your

 5    Honor, it does not expressly say track the number of miles

 6    between tire repairs, I mean, I'll concede that point.

 7    That's correct.  Nonetheless, other provisions in the

 8    contract say that any repairs of any costs submitted to the

 9    government need to be reasonable.  Other provisions say that

10    those repairs -- any costs need to be documented, and the

11    fact that the mileage is not tracked between tires, the fact

12    that, really, there is no explanation that can be offered

13    for the fact that 60 percent of the vehicles that Yang and

14    URS are responsible for are not meeting what GSA has

15    established as a benchmark for vehicles nationwide is

16    suggestive, is on top of everything else, suggestive of an

17    idea that an explanation for this is either intentional

18    fraud by certain individuals or at a minimum deliberate

19    ignorance or recklessness about why so many repairs are

20    being made, why so many early tire replacements are taking

21    place.

22         The other contention, Your Honor, is that --

23              THE COURT:  Wait a minute.  You said that the

24    tire's wear is not tracked, but it is tracked.  I mean, you

25    appear to know for every tire that's been replaced what the
```

1    mileage on those tires was.

2         MR. MEHTA:  I think on that point, Your Honor,

3    that and, you know, again, let me start and confess by

4    saying it is entirely possible that my colleagues have a

5    greater understanding of the process of this than I do.  But

6    my understanding of it is that what is being tracked is when

7    the tire repair facility logs the mileage that's tracked

8    when the vehicle comes in, that is how GSA is able to

9    determine mileage between the tire replacements.  But as I

10   understood it, Miss Everhart or anyone else in the Yang or

11   URS for that matter, was not themselves tracking the mileage

12   between replacements.  And the import, that the so what of

13   that is that the obligation of maintaining these vehicles

14   appropriately and reasonably under the contract falls with

15   URS.  Again, it doesn't fall with the government.  It's not

16   the government that tracks kind of the early repairs.  It's

17   URS and Yang.  In fact, URS is the only policy that they

18   themselves adopted and promulgated and suggested that they

19   would be the ones that would find and report instances of

20   misuse or abuse.  And so when we see an advocation of that

21   responsibility, when we see that Miss Everhart is not able

22   to tell us the mileage between tire repairs and we're

23   relying instead of on repair facilities and after the fact

24   conjecture about why this car went in or why it didn't go

25   in, that to us is an advocation of the responsibility to

```
 1    maintain the vehicle properly.  That to us at a minimum is
 2    recklessness or deliberate ignorance about the requirements
 3    of the contract and of maintaining vehicles in a reasonable
 4    and allowable manner.
 5         In addition to --
 6         THE COURT:  You know, these examples you give me
 7    in Exhibit E and when we talk about the Geo-Trac/Westlake
 8    mismatch, and, again, I just, you know, I don't understand
 9    how a reasonable interpretation of that necessarily includes
10    fraud or anything else.  And then below that you have a list
11    of tires that were serviced at Ramsey and their miles, and
12    I'm not sure -- what that shows is the average mileage for
13    those tires before they are replaced is 22,872 miles.
14         MR. MEHTA:  I'm sorry, Your Honor.  If I could
15    make sure I understand the thrust of the question.  The
16    point is on Exhibit E --
17         THE COURT:  Yeah.  On the bottom of the first page
18    there, you list five -- seven dates in which Ramsey replaced
19    a tire or two.
20         MR. MEHTA:  Yes.
21         THE COURT:  And it gives the miles that, as I
22    understand it, you're representing that, for example, on
23    March 25th Ramsey replaced two tires that had the tread wear
24    of 14,832 miles on them.  Right?
25         MR. MEHTA:  Your Honor, I don't think that's what
```

1  that number represents.  And I'll tell you what I believe

2  that represents.  Earlier we had a dialogue about the -- how

3  mileage is tracked between tires.  I believe that the number

4  miles on the right that you're looking at Exhibit E is the

5  miles for that vehicle, not necessarily specific to that

6  tire.  I don't think there's a way for Ramsey to be able to

7  track or Kennedy Space Center service to track mileage per

8  tire.

9       THE COURT:  I see.

10      MR. MEHTA:  So I think and where -- I think you

11  understand, Your Honor, is on March 25, 2011, that vehicle

12  had 14,000 miles on it.  Two tires were replaced that day.

13      THE COURT:  But for all we know, based on this

14  exhibit, those tires had been on the vehicle for 14,832

15  miles.

16      MR. MEHTA:  Based on this exhibit that's exactly

17  right.  And that would be under the 20,000 but nonetheless,

18  it's close to kind of where you would -- the baseline

19  established by GSA for the bill back.  That's correct, Your

20  Honor.  But then if look at the subsequent history, if you

21  look at October 1, 2012, one year later, the vehicle now has

22  about 7,000 more miles on it than previously.  And now two

23  new tires are being replaced.  Admittedly, according to this

24  exhibit, you cannot tell the precisely why or which tires

25  they are.  That's a threat.  But what you are seeing is

1   7,000 miles later two tires are being changed.  Then later

2   that month, 400 miles later, another tire is being replaced,

3   then six months later, with another 2,000 miles being

4   driven, another tire is being replaced.  Likewise, you know,

5   for the next subsequent dates you're seeing a pattern of

6   relative months passing, thousands of miles, not tens of

7   thousand of miles.

8           THE COURT:  Okay.  I understand now.  All right.

9           MR. MEHTA:  Thank you.  One last point, Your

10  Honor, if I may.  Under the False Claims Act the government

11  takes the position that not only is submitting a fraudulent

12  claim a problem, an actionable and viable clause, but

13  submitting a false record as well is actionable under the

14  False Claims Act.  Submitting a statement that attests to

15  something that is false to get a claim paid, that would be

16  actionable under the False Claims Act.

17      The record, as the government interprets it, is broadly

18  defined and could indeed be defined as a vehicle, submitting

19  a vehicle or submitting, you know, a statement or

20  attestation that something needs a replacement, that itself

21  could be actionable if that representation is false.

22      So the import of that so what that is that --

23           THE COURT:  But you would have to have a scienter.

24  You would have to show that the people submitting it knew it

25  was false.

1          MR. MEHTA:  Absolutely, Your Honor.  And I

2    completely agree with that, that the scienter point, again,

3    would be spectrum of either intentional falsity or

4    recklessness or deliberate ignorance of not knowing and just

5    choosing to submit that record, that claim, that statement.

6    We would take the position that too would be actionable

7    under the False Claims Act.

8          My last point, Your Honor, briefly if I may, is that to

9    the extent the Court is concerned about the sufficiency of

10   the evidence, this is a case that --

11          THE COURT:  Well, right now I'm just concerned

12   about the sufficiency of the pleading.

13          MR. MEHTA:  I apologize, Your Honor.  To the

14   extent the Court is concerned about the sufficiency of the

15   evidence here, this is a case where the government's been

16   engaged in conversations with the defendants for a matter of

17   months now.  And it's not a case where we're trying to seek

18   kind of a fishing expedition.  We've, in fact, made requests

19   of the defendants that they've complied with.  There's been

20   kind of a robust back and forth.  We would take the position

21   if the Court is at the end of the hearing concerned with the

22   evidence, that we have an opportunity to file amended

23   complaints to addressing any concerns the Court might have

24   and offer the full benefit of evidence that the government

25   has in its possession.

```
 1              THE COURT:  Okay.  Thank you.

 2              MR. MEHTA:  Thank you, Your Honor.

 3              MR. RAZI:  May I respond briefly?

 4              THE COURT:  Well, sure.

 5        I was going to just comment, I'm fairly familiar with

 6   the False Claims Act.  I think some years up here I have

 7   spent half my time dealing with False Claims Act, so anyway,

 8   with that --

 9              MR. RAZI:  Your Honor, I won't bore you with False

10   Claims Act law or 9(b) law, but I just want to make a few

11   observations and respond to a couple of comments that have

12   been made.  First of all, one of the challenges from our

13   side of the table in responding to this complaint is just

14   where to begin.  There are really several fundamental

15   failings in this pleading and, you know, but I don't want to

16   make light of it because this is a very serious case.  The

17   United States in this case has accused URS, a company that

18   tries to do the right thing, of fraud.  And there's a rule

19   that the Court well knows, Rule 9(b), that requires fraud

20   claims to be pled with particularity.  And the reason --

21   there are multiple reasons that will exist.  One of them is

22   so that we don't go through the guessing game that we've

23   seen, if I could call it that, so far.  A fraud case is not

24   supposed to be a moving target.  We read the complaint.  We

25   thought the fraud case was about one thing and we briefly
```

explained why one of their theories of fraud just doesn't

work, that improper recordkeeping cannot give rise to a

false claim.  They come back in their opposition, the

government, and apparently misunderstood because they said

that actually the recordkeeping, that was not one of their

theories.  Even though in paragraph 38 says if you submit a

claim where there's not a good enough record, it renders the

claim false.  That was the first exchange.  Then today the

Court asked, you know, what's this case about.  And I was

sitting over there and I was -- that was the first time I

had heard this notion of rogue employees taking tires off of

cars and doing something with them and none of that is in

the complaint.

And, you know, the exhibits for the complaint are

interesting.  And we're going to start getting into them.

What's very interesting, if you look at Exhibit E, what that

person says -- my favorite part of Exhibit E probably for a

fraud case is the re line.

THE COURT:  Is what?

MR. RAZI:  The subject line.  Okay.  What's the

subject line?  Potential.  Right?  You can't do a fraud

case, a fraud case is not potential.  You have to have the

goods and plead it.  And then what the e-mail goes on to say

is he's got a problem with one or two vehicles, and then he

says toward the end that, but I looked at the other eight

1   cars and, by the way, they're all fine.  And yet the

2   government extrapolates from the first part of his e-mail to

3   say that there are 1,079 false claims and that the two

4   examples that they picked out are representative.  But then

5   if you look at Exhibit F when they asked Miss Everhart about

6   those examples, the heading on Exhibit F is not

7   representative examples.  It's egregious examples.  And you

8   can't take an egregious example in a False Claims Act case.

9   If this was just a case about one or two vehicles that would

10  be one thing, but this is a case about 400 vehicles, 1,079

11  tire replacements as the government claims.  What they're

12  trying to do is take two little egregious examples and

13  extrapolate it onto the whole population of vehicles.

14       Now that being said, we're happy to have an argument, a

15  discussion about what they have on the two vehicles because

16  what they have on those vehicles is no false claims, no

17  false statements to anybody.  The government wasn't told

18  anything that was wrong.  No -- there's no allegation that

19  these tires didn't need replacing.  There's no allegation

20  that they weren't replaced.

21           THE COURT:  These are the 10 vehicles?  Are you

22  talking about in Exhibit E?

23           MR. RAZI:  Well, I'm just talking about the two

24  that are discussed in the complaint.  But yeah, the 10 if

25  you want, 10 has two they have problems with.  Nine and

1    eight they say are fine.

2              THE COURT:  Okay.  All right.

3              MR. RAZI:  But there's no allegation that anyone

4    ever said or did anything false to the government.

5    Remember, this is a False Claims Act case.  So that -- for

6    those reasons alone the complaint should be dismissed.  The

7    Court's question is a head scratcher and it's a great

8    question, right?  Why would anyone do this?  We have been

9    wondering that all along, just in terms of the mechanics of

10   how it all works.  This is entirely a pass through

11   situation.  So there's no -- there can be no credible

12   allegation of financial gain to URS or Yang in this

13   scenario.

14       We would just ask the Court to, as the Court is

15   apparently already doing and you read the complaint, we need

16   to strip away the labels and the conclusions and the false

17   this and fraud that and look very closely at what's actually

18   being alleged and ask is there any false claim here being

19   alleged, and there isn't.

20       And with respect to amendment, we understand the rules

21   on that, but we also understand that the plaintiff here is

22   the United States government, not just any plaintiff.  This

23   is a case that has been investigated for over a year.  If

24   they have investigated the case for over a year, and they

25   still don't know what their fraud theory is, I would submit

```
 1    that it may be futile to ask them to go back to the drawing
 2    board again, and --
 3              THE COURT:  It would also be futile of me to
 4    dismiss with prejudice and have you watch the 11th Circuit
 5    reverse me overnight.
 6              MR. RAZI:  Perhaps, Your Honor.  Perhaps.
 7         So unless the Court has any questions about our
 8    briefing or any of our arguments --
 9              THE COURT:  No.  I think, and I'm going to get to
10    you, I think that this has been helpful.  I mean, there are
11    situations where I think getting everybody together, good
12    lawyers and judges trying to understand is very helpful to
13    the process, and I do think there's somewhat of a -- from
14    the government's standpoint -- a vague and moving target
15    here.  I don't understand yet what the fraud is or how it
16    works, and it seems to be moving towards some sort of rogue
17    employees that haven't been identified in a complaint.  So I
18    think the complaint's deficient.  I'm just not sure how I
19    would rule it has to be amended.
20         So anyway, let me hear from the rest of the lawyers.
21              MR. RAZI:  Thank you for your time and attention
22    to the case, Your Honor.
23              THE COURT:  All right.  Mr. Hanson.
24              MR. HANSON:  Yes, sir.  Thank you, Judge.
25              THE COURT:  Where are you from?
```

```
 1                    MR. HANSON:  I'm from Miami, sir.

 2                    THE COURT:  Miami.

 3                    MR. HANSON:  Yes, sir.  Well, that's where I'm

 4        from now.  Originally, New Orleans, but Miami now.

 5                    THE COURT:  Welcome to central Florida.

 6                    MR. HANSON:  Thank you, Judge.  I have been here

 7        frequently, although not to your nice, new courthouse.  I

 8        have been to the old.  Not quite as nice.

 9                    THE COURT:  Well, they fixed it up.  It's the

10        bankruptcy court now.

11                    MR. HANSON:  Well, I remember the bankruptcy court

12        used to be across the railroad tracks.  We used to go over

13        there.

14            At any rate, Judge, there was a couple of points that I

15        wanted to clarify both in terms of your explication of how

16        this process works and just where Yang Enterprises fits in

17        this.  I think it's pretty clear URS has described they're

18        the prime contractor and Yang Enterprises is the

19        subcontractor.  And up until two years ago, Yank Enterprises

20        had no involvement whatsoever in the fleet management

21        situation.  It was only two years ago that the fleet

22        management came under Yang's umbrella.  Before that time,

23        they had -- they were a sub and were doing other things

24        under this contract but not fleet management.  So to the

25        extent that the United States is reaching back seven, eight,
```

```
 1    nine years looking for fraudulent tire replacement, as far

 2    as Yang Enterprises is concerned, anything beyond the couple

 3    years it's been involved in fleet management is outside its

 4    control.

 5              THE COURT:  What's the date of your subcontract

 6    with URS?

 7              MR. HANSON:  The original subcontract I believe

 8    was in April 2008 and the transfer of fleet management was

 9    in September 2012.

10              THE COURT:  Okay.

11              MR. HANSON:  And to that point of sort of control

12    and oversight, Your Honor described the process by which the

13    operator takes the vehicle to a service facility and the

14    fleet manager gets approval and they forward it on to GSA,

15    et cetera.  And that's correct as far as that goes, but

16    quite often there is the case where an operator -- the

17    operator takes the vehicle to the vendor, GSA-approved

18    vendor, and the vendor reaches out directly to GSA without

19    necessarily going through Yang or URS.  At the time URS was

20    in a fleet management position.  So there are occasions

21    where the fleet manager, per se, is circumvented altogether

22    because the vendors goes directly to GSA, and the one thing

23    is, Your Honor --

24              THE COURT:  Well, the fleet manager is not

25    circumvented.  Or the fleet manager may be, but, I mean,
```

 1    it's your employee that's taking the vehicle directly to the

 2    vendor.

 3          MR. HANSON:  Well, some of these vehicles, Judge,

 4    are operated by -- most of these vehicles are operated by

 5    contractor and the contractor employees including Yang

 6    Enterprises, including URS, including other vendors,

 7    contractors at KSC.  So, yes, those operators are going --

 8    taking, for example, a truck for Ramsey and then Ramsey

 9    rather than going back through the fleet manager chain goes

10    directly to GSA.  The reason for that is because in the case

11    of tires, okay?  These trucks and vehicles have all sorts of

12    maintenance done to them, oil changes, tune ups, plug and

13    flats, all that sort of thing, which each vehicle has its

14    own fleet card for which those expenses less than $100 are

15    paid for and that routes through GSA directly.  If it's an

16    expense, a maintenance expense in excess of $100, or any

17    time a tire is replaced, it has to be approved by GSA, the

18    GSA tech has to issue a PO for it, and it has to assign a

19    special charge number from GSA directly to the vendor.  And

20    the vendor gets paid directly by GSA for that.  So in that

21    instance, what happens is the vendor submits its request for

22    payment to GSA, GSA approves those, and then sends its

23    monthly invoice to URS which then passes it on to NASA and

24    to Yang Enterprises as the fleet manager to pay the GSA

25    invoice.  So the point being that there are oftentimes when

```
 1   operators will and vendors will deal directly with GSA, not

 2   necessarily coming through the fleet management.

 3             THE COURT:  Wait a minute.  I am confused at this

 4   point.  You said in these instances it goes directly to the

 5   vendor.  The vendor gets an approval PO from GSA, the work

 6   is performed, GSA then directly pays the vendor and then you

 7   had GSA getting paid again, or something like that.

 8             MR. HANSON:  GSA provides the vendor with a

 9   special number, not the regular fleet card that ordinarily

10   maintenance would be done, but the GSA provides the vendor

11   with a special, let's call it, charge number specifically

12   for that repair tied to that specific PO for that particular

13   tire replacement, and the vendor bills GSA for that, gets

14   paid under that charge number.  So that's a direct

15   relationship between GSA and its repair vendor.  GSA then

16   takes that expense that it's accrued and passes it through

17   by invoice to URS.

18             THE COURT:  Why?

19             MR. HANSON:  Because these vehicles are owned by

20   GSA.  They're leased to NASA.

21             THE COURT:  But if GSA has paid for a tire on its

22   vehicle, why do they have to notify anybody what they have

23   done?

24        I don't understand.  If an invoice has already been

25   paid, why are they invoicing somebody else?
```

1          MR. HANSON:  Because they're looking to get that

2    money back from NASA because the maintenance of the vehicle,

3    the lease payment for the vehicle and all the maintenance

4    expenses for the vehicle are the ultimate responsibility of

5    NASA.  And so they have to get the money back and the way it

6    works is GSA in a sense fronts that.

7          THE COURT:  Okay.  Well, that's an accounting

8    function between GSA and NASA.

9          MR. HANSON:  And it goes through URS and Yang

10   Enterprises.

11         THE COURT:  Okay.

12         MR. HANSON:  So there's a payment sequence but --

13         THE COURT:  None of this is -- I mean, this is all

14   outside the four corners of the complaint.  I'm trying to

15   get an understanding of how this process works.

16         MR. HANSON:  I understand.  And although some of

17   these processes are included in various contracts that are

18   attached to the complaint -- but to the extent that Your

19   Honor was trying to get a sense of how these payments work,

20   I wanted you to understand that not every request for

21   payment and not every payment passes through URS or Yang

22   Enterprises, that even if that's the preferred process,

23   vendors sometimes go directly to GSA and even if they do go

24   through the fleet manager chain, GSA is independently

25   approving and assigning a --

```
1            THE COURT:  I don't see how that makes any

2    difference in the analysis, frankly, but okay.

3            MR. HANSON:  Understood.

4        The other thing, Judge, I just wanted to make clear is

5    to the extent Your Honor mentioned that this discussion, my

6    discussion is perhaps beyond the four corners of the

7    complaint, some of these other things today were outside the

8    four corners --

9            THE COURT:  Sure.

10           MR. HANSON:  -- of the complaint.  But I just want

11   to be clear to the extent that the government has alluded

12   both in its brief and today in argument that the parties --

13   I believe Mr. Mehta said the defendants have been engaged in

14   discussions for many months.  Yang Enterprises has not been

15   involved in any discussions with the United States regarding

16   these charges.  It wasn't aware that there was a claim being

17   made until it was served with the complaint.  It was aware

18   there was an investigation.  It cooperated with the

19   government.  But there haven't been any discussions between

20   Yang Enterprises.  And to the extent that was represented, I

21   wanted to correct that.

22       I would echo the fact that today, again, for the first

23   time we're hearing about this scheme of rogue employees

24   removing good tires, selling them on the black market,

25   putting bad tires on.  That's not within the complaint.
```

1    That's not anything that we have seen before.  And at a

2    minimum, if that's going to be the gravamen of the United

3    States' complaint, then that needs to be set forth with a

4    whole lot more clarity in any amended pleading.  Thank you.

5             THE COURT:  Mr. Mehta, do you have final words of

6    wisdom for me?

7             MR. MEHTA:  I don't think I have words of wisdom,

8    but I do have final words.

9             THE COURT:  Okay.

10            MR. MEHTA:  Your Honor, the risk of appearing

11   somewhat out of place on this, as this Court knows for a

12   fraud case we don't take the position that we need to allege

13   today with certainty in the complaint the motivation and the

14   rationale and the explanation for why certain individuals

15   would commit fraud.  Instead, we take the position we need

16   to allege the who, what, when, where and how.  And we need

17   to allege that with particularity as Rule 9 requires.

18            THE COURT:  But I don't think you have done that.

19            MR. MEHTA:  Understood, Your Honor.  But to be

20   clear to the extent this is an issue about motivations and

21   kind of explanations and, you know, the rationales and

22   motivations for certain individuals, I want to make clear

23   the government did not elaborate on that point in its first

24   complaint because it did not understand that that was the

25   requirement to plead a successful fraud case.

 1          THE COURT:  I mean, I agree with you to a point,

 2   but when someone has been practicing -- I don't want to say

 3   practicing business law or been screwing up business law for

 4   as long as I have, reads the complaint over and over again

 5   and doesn't understand the fraud, there's something wrong

 6   with that complaint.

 7          MR. MEHTA:  Understood.

 8      If I might turn to that point for a moment, Your Honor.

 9   I understand where the Court is and, again, I would kind of

10   reiterate the request that if that's where the Court ends up

11   with this, that we be given the opportunity to try to --

12          THE COURT:  I'll give you that opportunity.  I'm

13   required to by the 11th Circuit.

14          MR. MEHTA:  And so I appreciate that, but if I

15   might, nonetheless, try, you know, with one more -- with

16   some fashion and force behind it explain to you why it is

17   that we believe we satisfied in this draft of this

18   complaint, the who, what, when, where, the Rule 9(b)

19   particularity requirements.  This isn't a case where we've

20   given one vehicle.  It's not a case where we've given two

21   vehicles.  It's not a case where we've given the statements

22   of one individual.  It's not a case where we have taken the

23   statements of one individual and taken them out of context.

24   Instead this, as we alluded to in our response to URS's

25   motion to dismiss, is a case where we presented a cascading

```
 1   set of evidence, and admittedly, the government has somewhat

 2   hamstrung a lot of documentation and a lot of evidence, and

 3   that in large part is because our efforts to produce that

 4   evidence and to review that evidence have been met with the

 5   fact that URS tells us that they don't have the documents to

 6   support many of these tire replacements.  So we're hamstrung

 7   by not having the evidence and the documents required.

 8   Number one, on one hand.  And number two, we have pled a

 9   cascading set of evidence at what we do have.  And what we

10   do have is we have a case initiating and kicking off with

11   not, you know, a government agent going out and knocking on

12   doors, but rather with a third party repair person who

13   actually stands to benefit from doing more repairs, calling

14   the government proactively.  He, as referenced in Exhibit E,

15   is a repairman from Ramsey, calling the government and

16   saying, I see some concerns.  I see a vehicle with tires

17   that I don't recognize and with a line of patterns that

18   don't appear consistent.  That's what kicks this all off.

19   That's Exhibit E.  That's in the complaint.  Then what we

20   have on top of all that --

21           THE COURT:  But that's -- we got 400 vehicles

22   times six years times one issue that I think has a very

23   innocent explanation.  I don't know what the answer is, but

24   it certainly is not necessarily fraud.

25           MR. MEHTA:  Understood, Your Honor.
```

1        And so if the entirety of the complaint was simply the

2   one e-mail from Stephen Vaughn from GSA with potential tire

3   fraud, I think we end the case there.  But there is much

4   more and this is how we more affirm the potential tire fraud

5   in the government's eyes to actual fraud, and if I can

6   explain where it is and how we get there.

7        We have that one tire.  We then take a kind of holistic

8   view of what did the data, what does the analysis show of

9   the entirety and the entire fleet of vehicles that URS and

10  Yang are required to maintain.  You look at that and you see

11  kind of an aberrational pattern.  You see the 60 percent of

12  vehicles are not lasting to what GSA and based on advice and

13  counsel from, you know, experts from the field of vehicle

14  management are telling them would be the normal and typical

15  expectation for tire repairs.  So you have 60 percent of

16  vehicles not meeting kind of that threshold.  That alone I

17  give you, Your Honor, is not a fraud case, right?  In taking

18  the statements of one individual with potentially an

19  innocuous explanation and then adding, you know, this

20  statistical evidence of 60 percent of vehicles not meeting

21  that 20,000, but then on top of that you take some other

22  evidence, you take the idea that when interview -- when the

23  person responsible for maintaining these vehicles is

24  interviewed, whether we mischaracterize it or not, at least

25  the report, Exhibit F, says that she is unable to offer an

1    explanation for these repairs and she does not have

2    documentation to explain these repairs.  When you take that

3    on top of --

4              THE COURT:  But, but she does.  She's got -- she's

5    got the operator who thought it needed repair.  She's got

6    the fleet manager who agreed that it needed repair.  She's

7    got the vendor who apparently made all these changes without

8    complaint.  She's got the GSA who approved the payment.

9    There's plenty of explanation.  What else do you want to get

10   from the government to prove your case -- I mean from the

11   defendants?

12             MR. MEHTA:  That's very -- and let me answer that

13   question directly and then let me respond.  What else we

14   would need to prove this case, or to disprove this case, is

15   actual documentation of evidence and it has to be for each

16   and every one of these tire repairs.

17             THE COURT:  Well, all right.  And how do you

18   purport to get that?  You're going to take every tire, track

19   down the operator who decided it needed to be taken in, go

20   through the fleet manager and the whole process, ask the GSA

21   person why they approved it.

22             MR. MEHTA:  How we purport to get there, Your

23   Honor, is the way that we attempted to do this back last

24   summer before we ever got to a courtroom which was send an

25   investigative and administrative subpoena and ask for

1  documentation about 20, quote/unquote, egregious tire

2  repairs.  Understand those 20 vehicles, understand why is it

3  that we're seeing tire repairs when the vehicles only lasted

4  800 to 2400 miles.  And the response we got, which

5  admittedly were outside the four corners of the complaint,

6  but to answer your question, the response, we don't maintain

7  that documentation.  We don't have that.  We can't tell you

8  why, today, years later, but within the statute of

9  limitation's time, why it is that we submitted these

10  vehicles for tire repair when they only had 800 miles on

11  them.

12         THE COURT:  That's your case, basically.  What

13  you're telling me is discovery is not going to do any

14  better.  You already subpoenaed that information and you got

15  nothing.  So there's nothing there to get.

16         MR. MEHTA:  Your Honor, so -- well, first of all,

17  I do think there is some case law on point to suggest that

18  when the government's unable to generate documentation to

19  prove this theory of fraud because either they're hamstrung

20  by the defendant getting the documentation or because the

21  defendant has for whatever reason not maintained the

22  documentation in requirements of certain contracts, there is

23  case law to suggest that that can at a minimum be suggestive

24  or that can create an inference.

25         THE COURT:  But you see, I'm a contract lawyer and

1    have been for a long time, show me any contract where -- you

2    have got a contract with these people, right?  You were

3    paying them a billion dollars pursuant to a contract.  I

4    assume it's a fairly well-written contract.  Where in that

5    contract does it say what records they should keep in this

6    regard?

7              MR. MEHTA:  Well, it does say that.  Again, and

8    admittedly, and I'll concede up front that it's not

9    explicit, but not explicitly clear as much as I'd like

10   today, but it does say that any cost submitted to the

11   government needs to be reasonable, allowable and --

12   allowable.  And the phrase allowable suggests to me that it

13   needs to be explained and it needs to be pointed somewhere

14   and it needs to be something to suggest that.  And

15   admittedly -- you know, I'll admit this is a bit of a

16   stretch, but at the same time I'll tell you that when we

17   expect -- when we see a tire repair shop tell us we see

18   problems, we are seeing something suspicious that we don't

19   normally see.  When we see 60 percent or more than 50

20   percent of the vehicles are having early replacements that

21   are not explainable, when we talk to someone that manages

22   this fleet and she tells us I don't have the documentation,

23   we're left in a position where all we can say is that the

24   repairs that were done were repairs that were done at best

25   with some type of deliberate ignorance, some type of

1   deliberate disregard for whatever they were necessary.  And

2   in that I don't think I'm reading too far into what Miss

3   Everhart says, and if I can point the Court one more time to

4   a different part of Exhibit F or statement.  It's the second

5   page where she says -- Everhart stated she doesn't contact

6   the operators. (Indiscernible)

7          THE COURT REPORTER:  Wait. Wait. Wait.  I didn't

8   understand you. "Everhart stated she doesn't contact the

9   operators."

10          THE COURT:  Don't read to me.  I have got those

11   documents.

12          MR. MEHTA:  But I think the thrust of that, Your

13   Honor, is that, well, there is a system in place.  While

14   there certainly are other operators -- well, there's other

15   tire repair facilities.  The government is getting the phone

16   calls from the tire repair facilities and, you know, it's

17   relying on the veracity of what the tire repair facilities

18   are saying.  There is a process in place.  I'll give you

19   that.  The problem is the process isn't involved here.  And

20   that in our eyes is either recklessness, either never asking

21   why there is such high frequency of tire repairs in cases

22   that don't seem to make sense, between 800 and 2,400 miles,

23   or it's either recklessness or it's kind of a deliberate,

24   you know, ignorance about what it is that the government is

25   requesting in its vehicle operators.  And it's requesting

1   them to keep track of that fleet of vehicles.  That's why

2   we're paying very handsomely to two contractors to do this

3   type of work.

4        The thrust of the case, Your Honor, again, simply is,

5   is we didn't plead the motivations explicitly because we

6   understood that was to be a requirement of 9(b).  We did

7   plead the evidence that we have.

8        We certainly would appreciate the opportunity if the

9   Court is not satisfied with that evidence to try again,

10  and -- but we think even based on this record and based on

11  this complaint that there is enough there to satisfy what's

12  admittedly been described as even a fraud case.  It's a

13  standard, it's a low one, but it needs to be met with

14  particularity.  And we think this complaint does it.

15       But if the Court disagrees, we would very much welcome

16  a chance to try again.

17            THE COURT:  All right.  Thank you, sir.

18       You want any final?

19            MR. RAZI:  Not in terms of argument, Your Honor,

20  but I just make one sort of housekeeping request.

21            THE COURT:  Sure.

22            MR. RAZI:  In the event that the Court does

23  dismiss the complaint, this version of it and give the

24  government leave to amend, I wonder if it wouldn't be more

25  efficient for everybody if -- for the government to just

```
 1    focus on its new complaint and its new allegations and not

 2    perhaps put off for some time other case management-related

 3    deadlines and obligations just for efficiency of everyone

 4    involved.

 5             THE COURT:  Well, I -- we have -- you're talking

 6    about discovery trying to --

 7             MR. RAZI:  Yeah.  I think under the rules we would

 8    have a conference, a discovery planning conference among

 9    counsel, and then maybe even some discovery would start, and

10    just seems to me we don't even know what the theory is yet.

11             THE COURT:  Well, you deal with that when you file

12    your case management report and if your position is we

13    shouldn't start discovery right now, you put that in there

14    and I'll deal with it.

15             MR. RAZI:  Perfect.  Thank you, Your Honor.

16             THE COURT:  Well, basically, your complaint in a

17    nutshell as I understand it as follows:  We have a

18    contractor that maintains hundreds of vehicles and has for

19    years.  We have a couple instances of questionable tire

20    replacement.  And in GSA's view tires, generally, on all

21    these vehicles, should last 20,000 miles and a lot of these

22    have been replaced before that, and even though we can't

23    even suggest a motive of why this contractor would do this

24    since there is no self-interest involved, we want to sue

25    them for fraud under the False Claims Act and that just
```

1  doesn't get there.  I mean, that's -- I can sit back there

2  for two or three weeks and write an order trying to explain

3  that or you can just replead based on what I have -- the

4  concerns I have addressed here.

5       You know, vehicles are different.  Tires are different.

6  I have got some tires that only last 5,000 miles or less.

7  But it's on my race car.  So I can look at a flattened out

8  tire and tell you after 500 miles it needs to be replaced.

9  Tires are different.  Some are with a tread rate of 200,

10  some are 400, some are less.  And we have got -- I assume

11  these are all different kinds of vehicles, right?  Big

12  vehicles, small vehicles?  And the theory that it just -- I

13  just can't connect the dots here as to why -- what the

14  government's contention is concerning fraud.  Breach of

15  contract maybe?  I don't know.  But I just don't see the

16  fraud as alleged.  So I'm going to grant the motion and

17  because I'm kind of swamped with other things, I may just do

18  it based on our proceedings here today and hope that it's

19  clear enough that you can take my concerns and try again.

20            MR. MEHTA:  Absolutely, Your Honor.

21            THE COURT:  Okay.  All right.  Well, I'm sorry to

22  take so much of your time, but I wanted to try to understand

23  this better before we got deeper into it.

24            MR. MEHTA:  Your Honor, before we adjourn, by

25  which date does the government have to file an amended

1   complaint?

2           THE COURT:  It's up to you.  I don't care.

3           MR. MEHTA:  If I could have three weeks, Your

4   Honor.

5           THE COURT:  Sure.  You want to wait till the first

6   of the year?

7           MR. MEHTA:  That would be great, Your Honor.

8           THE COURT:  How about the first Monday in January?

9           MR. MEHTA:  Perfect, Your Honor.

10          THE COURT:  Okay.  All right.  Thank you all.

11          (hearing adjourned at 2:27 p.m. )

12              C E R T I F I C A T E

13          I certify that the foregoing is a correct

14  transcript from the record of proceedings in the

15  above-entitled matter.

16

17  s\Sandra K. Tremel            December 9, 2015

18

19

20

21

22

23

24

25